**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 16-1230**

─────────────

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff - Appellee,

v.

CONSOL ENERGY, INC.; CONSOLIDATION COAL COMPANY,

Defendants - Appellants.

─────────────

**No. 16-1406**

─────────────

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff - Appellant,

v.

CONSOL ENERGY, INC.; CONSOLIDATION COAL COMPANY,

Defendants - Appellees.

─────────────

Appeals from the United States District Court for the Northern District of West Virginia, at Clarksburg.  Frederick P. Stamp, Jr., Senior District Judge.  (1:13-cv-00215-FPS)

─────────────

Argued:  December 7, 2016                    Decided:  June 12, 2017

─────────────

Before NIEMEYER, TRAXLER, and HARRIS, Circuit Judges.

———————

Affirmed by published opinion.  Judge Harris wrote the opinion, in which Judge Niemeyer and Judge Traxler joined.

———————

**ARGUED**: Jeffrey Alan Holmstrand, GROVE, HOLMSTRAND & DELK, PLLC, Wheeling, West Virginia, for Appellants/Cross-Appellees.  Philip Matthew Kovnat, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellee/Cross-Appellant.  **ON BRIEF**: Jeffrey A. Grove, GROVE, HOLMSTRAND & DELK, PLLC, Wheeling, West Virginia, for Appellants/Cross-Appellees.  P. David Lopez, General Counsel, Jennifer S. Goldstein, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Elizabeth E. Theran, Office of General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellee/Cross-Appellant.

———————

2

PAMELA HARRIS, Circuit Judge:

For 37 years, Beverly R. Butcher, Jr. worked without incident as a coal miner at the Robinson Run Mine, owned by appellant Consol Energy, Inc. But when Consol implemented a biometric hand scanner to track its employees, Butcher, a devout evangelical Christian, informed his supervisors that his religious beliefs prevented him from using the system. And although Consol was providing an alternative to employees who could not use the hand scanner for non-religious reasons, it refused to accommodate Butcher's religious objection. Forced to choose between his religious commitments and his continued employment, Butcher retired under protest.

The United States Equal Employment Opportunity Commission (EEOC) sued on behalf of Butcher, alleging that Consol violated Title VII by constructively discharging Butcher instead of accommodating his religious beliefs. After trial, the jury returned a verdict in favor of the EEOC. Butcher was awarded compensatory damages and lost wages and benefits, but not punitive damages; the EEOC's evidence, the district court ruled, could not justify an award of punitive damages under the standard set out in Title VII. The district court subsequently denied Consol's post-verdict motions seeking judgment as a matter of law, a new trial, and amendment of the district court's findings regarding lost wages.

We agree with the district court that Consol is not entitled to judgment as a matter of law: The evidence presented at trial allowed the jury to conclude that Consol failed to make available to a sincere religious objector the same reasonable accommodation it offered other employees, in clear violation of Title VII. And we find no error in the host

of evidentiary rulings challenged by Consol in its motion for a new trial, nor in the district court's determinations regarding lost wages and punitive damages. Accordingly, we affirm the district court judgment in all respects.

## I.

### A.

Butcher began work with Consol in April of 1975, and in September of 1977 started at Consol's Robinson Run Mine, in West Virginia. For almost 40 years, Butcher by all accounts was a satisfactory employee, with no record of poor performance or disciplinary problems. Butcher also is a life-long evangelical Christian. An ordained minister and associate pastor, he has served in a variety of capacities at his church: as a member of the board of trustees, as part of the church's worship team, as a youth worker, and as a participant in mission trips.

For 37 years, Butcher's employment with Consol posed no conflict with his religious conduct and beliefs. But in 2012, a change to the daily operations of the Robinson Run Mine put Butcher's religious beliefs at odds with his job. In the summer of 2012, Consol implemented a biometric hand-scanner system at the mine, in order to better monitor the attendance and work hours of its employees. The scanner system required each employee checking in or out of a shift to scan his or her right hand; the shape of the right hand was then linked to the worker's unique personnel number. As compared to the previous system, in which the shift foreman manually tracked the time

4

worked by employees, the scanner was thought to allow for more accurate and efficient reporting.

For Butcher, however, participating in the hand-scanner system would have presented a threat to core religious commitments. Butcher, who testified that his religious beliefs are grounded in the "authenticity . . . [and] authority of the scriptures," J.A. 675, believes in an Antichrist that "stands for evil," J.A. 676, and that the Antichrist's followers are condemned to everlasting punishment. Butcher's understanding of the biblical Book of Revelation is that the Mark of the Beast brands followers of the Antichrist, allowing the Antichrist to manipulate them. And use of Consol's hand-scanning system, Butcher feared, would result in being so "marked," for even without any physical or visible sign, his willingness to undergo the scan – whether with his right hand or his left – could lead to his identification with the Antichrist. That Butcher is sincere in these beliefs is not disputed.[1]

Butcher brought his concerns to his union representative, who alerted Consol's human resources department. According to Butcher, he was then instructed by Consol to provide "a letter from my pastor explaining why I needed a religious accommodation." J.A. 692. Butcher obtained a letter from his pastor vouching for Butcher's "deep dedication to the Lord Jesus Christ." J.A. 1174. He also prepared his own letter, citing verses from the Book of Revelation and explaining his view that the hand scanner would

---

[1] Indeed, this is not the first time that Butcher has requested an exemption from a scanner system. In 2011, Butcher sought to exclude his grandchildren from a new finger-scanning system for school lunches, given his concerns about the Mark of the Beast.

associate him with the Mark of the Beast, causing him through his will and actions to serve the Antichrist. Butcher ends the letter by stating:

> As a Christian I believe it would not be in the best interest of a Christian believer to participate in the use of a hand scanner. Even though this hand scanner is not giving a number or mark, it is a device leading up to that time when it will come to fruition, and in good faith and a strong belief in my religion, I would not want to participate in this program.

J.A. 1173.

In June of 2012, Butcher met with Mike Smith, the mine's superintendent, and Chris Fazio, a human resources supervisor, to discuss his situation. Butcher provided Smith and Fazio with the letter from his pastor as well as his own letter, and explained that the hand-scanner system was not one that he "could or would want to participate in," as a Christian. J.A. 694. According to Butcher, and consistent with the religious beliefs described above, the objection he described extended to the scanning of either hand, and was not limited to use of his right hand. Unaware of any other means of accommodating his religious concerns, Butcher offered to check in with his shift supervisor or to punch in on a time clock, as he had in the past while working at the mine.

In response, Fazio gave Butcher a letter written by the scanner's manufacturer, offering assurances that the scanner cannot detect or place a mark – including the Mark of the Beast – on the body of a person. Offering its own interpretation of "[t]he Scriptures," the letter explained that because the Mark of the Beast is associated only with the right hand or the forehead, use of the left hand in the scanner would be sufficient to obviate any religious concerns regarding the system. J.A. 1175. Fazio and Smith

asked that Butcher review this information with his pastor, and, if he continued to object, provide a letter attesting to his church's opposition to the scanner system.

At roughly the same time, and unbeknownst to Butcher, Consol was providing an accommodation to other employees that allowed them to bypass the new scanner system altogether.  As of July 2012, Consol had determined that two employees with hand injuries, who could not be enrolled through a scan of either hand, instead could enter their personnel numbers on a keypad attached to the system.  According to Consol's own trial witness, this accommodation imposed no additional cost or burden on the company, and allowing Butcher to use the keypad procedure would have been similarly cost-free.

Nevertheless, Consol continued to resist making the same accommodation for Butcher, and instead decided that Butcher would be required to scan his left hand.  The disparity in treatment was highlighted by a single email dated July 25, 2012, simultaneously authorizing the keypad accommodation for the two employees with physical injuries and denying that accommodation to Butcher:   "[L]et's make our religious objector use his left hand."  J.A. 1192.

Butcher was notified of Consol's decision at a meeting with Smith and Fazio on August 6, 2012.  At Butcher's request, the meeting was deferred until August 10, 2012, so that Butcher could consider the option of using his left hand in the scanner.  Butcher used that time, he testified, to go "back to the scriptures again" and to "pray[] very hard" about his dilemma.  J.A. 708.  On August 10, Butcher told Smith and Fazio that "in good conscience [he] could not go along with this system of scanning [his] hand in and out."  J.A. 709.  Smith promptly handed Butcher a copy of Consol's disciplinary procedures

7

regarding the scanner, with the promise that it would be enforced against him if he refused to scan his left hand. According to the policy, an employee's first and second missed scans each would result in a written warning; the third would result in a suspension; and a fourth would result in suspension with intent to discharge. Butcher believed the message was clear: "If I didn't go along with the hand scan system, their intent . . . was to fire me." J.A. 711.

Butcher responded to this ultimatum by tendering his retirement. According to Butcher, he emphasized that he did not want to retire: "I didn't have any hobbies, I wasn't ready to retire . . . . I reiterated again, you know, that I really believed and tried to live by the scriptures and, well, almost practically just begged them to find a way to keep my job." J.A. 711. But when Consol remained unsympathetic, Butcher felt he had no choice but to retire under protest.

Shortly after retiring, Butcher learned from his union, the United Mine Workers of America ("UMWA"), about the keypad accommodation Consol had offered other employees. The union then filed a grievance on behalf of Butcher pursuant to its collective bargaining agreement with Consol, based on Consol's failure to accommodate Butcher's religious beliefs. The UMWA subsequently withdrew the grievance, however, when it determined that its agreement with Consol did not require religious accommodations.

In the meantime, Butcher, facing what he viewed as pressing financial need, sought new employment. In the summer and fall of 2012, he attended job fairs; looked for job postings; and applied for various jobs, including a position at the one coal mine he

knew to have a vacancy.  After several months of unsuccessful job-hunting, Butcher was hired by a temporary employment agency in October of 2012 to work as a carpenter helper.  In September of 2013, Butcher accepted a better-paying construction position at another company, and he remained at that company for the duration of the trial.

**B.**

The EEOC brought an enforcement action against Consol on behalf of Butcher, alleging that Consol violated Title VII of the Civil Rights Act of 1964 by failing to accommodate Butcher's religious beliefs and constructively discharging him.  *See* 42 U.S.C. §§ 2000e to 2000e-6 (2012).  It sought compensatory and punitive damages, back and front pay and lost benefits, and injunctive relief.

The case was tried before a jury in January of 2015.  At the close of the EEOC's evidence, the district court granted Consol's Rule 50(a) motion for judgment as a matter of law on the issue of punitive damages.  As the district court explained, punitive damages are available under Title VII only if a defendant employer has acted "with malice or with reckless indifference" to a plaintiff's protected rights.  42 U.S.C. § 1981a(b)(1).  Here, the district court concluded, the EEOC's evidence was insufficient to meet that standard; no reasonable jury could find "malice or reckless indifference to the rights of Mr. Butcher."  J.A. 903.

The jury ultimately returned a verdict in favor of the EEOC, finding Consol liable for failing to accommodate Butcher's religious beliefs.  The jury made findings as to each of the three elements of a Title VII reasonable accommodation claim:  that Butcher had sincere religious beliefs in conflict with Consol's requirement that he use the hand

scanner; that Butcher had informed Consol of this conflict; and that Consol constructively discharged Butcher for his refusal to comply with its directions.

The district court had instructed the jury on its authority to award compensatory damages in the event that it found a Title VII violation, distinguishing compensatory damages from lost wages and emphasizing that the jury "should not consider the issue of lost wages in [its] deliberations." J.A. 1140. Nevertheless, in the blank on the jury form for compensatory damages, the jury wrote in "salary plus bonus & pension, court cost." J.A. 357. After conferring with the parties, the district court reinstructed the jury on compensatory damages and sent the jury back for further deliberations, clarifying that "[t]he fact that I am sending you back does not indicate my feelings as to the amount of damages or whether damages . . . should be awarded." J.A. 1162–63. Ten minutes later, the jury returned a second verdict, this time awarding $150,000 in compensatory damages. In response to a poll requested by Consol, each member of the jury confirmed that no portion of the $150,000 award consisted of lost wages.

After briefing by the parties, the court held an evidentiary hearing on equitable remedies, including front and back pay and lost benefits, and on the EEOC's request for a permanent injunction against Consol, prohibiting further violations of Title VII's reasonable accommodation provision. With respect to lost wages and benefits, the parties differed on two main issues: whether Butcher's post-retirement job search satisfied his duty to mitigate his damages, and whether the pension benefits Butcher received after retiring should be offset from any award. The district court determined that Butcher properly mitigated his damages and that Butcher's pension benefits were a "collateral

source" that should not be deducted from a damages award. The court awarded Butcher $436,860.74 in front and back pay and lost benefits, and issued a permanent injunction against Consol, requiring Consol to refrain from future violations of Title VII's reasonable accommodation provision and to provide management training on religious accommodations.

After judgment was entered, Consol filed three post-verdict motions that are the subject of this appeal. In a renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, Consol argued that there was insufficient evidence to support the jury's verdict against it. In a Rule 59 motion for a new trial, Consol raised multiple challenges to rulings made by the district court during the course of trial, and argued that the jury's compensatory damages award was unsupported by the evidence. And in a Rule 59 motion to amend the district court's findings and conclusions on equitable remedies, Consol took issue with the court's award of front and back pay and lost benefits.

In a comprehensive and carefully reasoned opinion, the district court denied all three motions. Consol timely appealed, and the EEOC filed a timely cross-appeal of the district court's ruling on punitive damages.

## II.

Consol first challenges the denial of its renewed motion for a judgment as a matter of law, arguing that the district court erred in concluding that there is sufficient evidence to support the jury's verdict against it. We review de novo the district court's denial of

Consol's motion. *Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999). In so doing, we give the non-movant – here, the EEOC – the "benefit of every legitimate inference in [its] favor." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). So long as there exists "evidence upon which a jury could reasonably return a verdict for [the EEOC]," we must affirm. *Id.* (internal quotation marks omitted).

Title VII makes it an unlawful employment practice "to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Under that provision, an employer must "make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)); *see also* 42 U.S.C. § 2000e(j) (defining "religion" to include "all aspects of religious observance and practice, as well as belief," unless employer can show that accommodation of employee's religion would impose an "undue hardship on the . . . employer's business"). To show a violation of this "reasonable accommodation" duty, as the district court explained, an employee must prove that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." J.A. 1678 (quoting *Firestone Fibers*, 515 F.3d at 312).

On appeal, as before the district court, Consol argues primarily that the evidence presented at trial was legally insufficient to support the jury's specific findings under the first and third of these elements: that there was a conflict between a bona fide religious

belief held by Butcher and the requirement that Butcher use the hand scanner, and that Butcher was constructively discharged as a result. We agree with the district court that the evidence fully supports the jury's verdict on both these points, and therefore affirm the court's denial of Consol's motion for judgment as a matter of law.[2]

## A.

The core of Consol's defense is that it did not fail to reasonably accommodate Butcher's religious beliefs because there was in fact no conflict between Butcher's beliefs and its requirement that Butcher use the hand scanner system. Highlighting the fact that Butcher testified – consistent with his letter to Consol, *see* J.A. 1173 – that the system would not imprint a physical mark on his hand, Consol argues that the EEOC failed to establish that Butcher could not use the scanner system without compromising his beliefs regarding the Mark of the Beast.

The district court disagreed, and properly so. In both his letter to Consol and his trial testimony, Butcher carefully and clearly laid out his religious objection to use of the scanner system, notwithstanding the fact that it would produce no physical mark. As the

---

[2] Consol also renews its argument that there is insufficient evidence that Consol actually functioned as Butcher's employer for purposes of Title VII, given that the Robinson Run Mine was owned by a Consol subsidiary during the relevant time period. The district court rejected that contention. As evidence that Consol "control[led] the subsidiary's employment decisions" sufficient to make it a Title VII employer, *see Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987), the district court pointed to the fact that the hand scanner policy (and attendant progressive disciplinary procedure) was established by Consol; that Butcher's request for an accommodation was considered and denied by Consol personnel; and that Butcher's retirement and benefits documents were issued by Consol employees. We find no error in the district court's ruling on this point.

district court explained, there was ample evidence from which a jury could conclude that Butcher sincerely believed "participation in this system" – with or without a tangible mark – "was a showing of allegiance to the Antichrist," inconsistent with his deepest religious convictions. J.A. 1679. That is all that is required to establish the requisite conflict between Butcher's religious beliefs and Consol's insistence that he use its scanner system.

At bottom, Consol's failure to recognize this conflict – in its dealings with Butcher as well as its litigation of this case – appears to reflect its conviction that Butcher's religious beliefs, though sincere, are mistaken: that the Mark of the Beast is not, as Butcher believes, associated with mere participation in a scanner identification system, but instead manifests only as a physical mark, placed upon the right and not the left hand; and that as a result, allowing Butcher to scan his left hand through the system would be more than sufficient to obviate any potential conflict. Thus, Consol relied in its discussions with Butcher and again in litigation on the letter from the manufacturer of the scanner system, which interpreted scripture to find that the Mark of the Beast is identified only with the right hand. It points to evidence that Butcher's pastor does not share Butcher's belief that there is a connection between the scanner and the Mark of the Beast. Indeed, Consol opened its oral argument before this court with quotations from scripture purporting to demonstrate that the Mark of the Beast can be imprinted only on the right hand.

But all of this, of course, is beside the point. It is not Consol's place as an employer, nor ours as a court, to question the correctness or even the plausibility of

14

Butcher's religious understandings. *See Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine . . . the plausibility of a religious claim."). Butcher's religious beliefs are protected whether or not his pastor agrees with them, *cf. Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715–16 (1981) (protection of religious beliefs not limited to beliefs shared by religious sect), and whether or not Butcher's pastor – or Consol, or the manufacturer of Consol's scanning system – thinks that Butcher, in seeking to protect his religious conscience, has drawn the line in the right place, *see id.* at 715 ("[I]t is not for us to say that the line [the religious objector] drew was an unreasonable one.").[3] So long as there is sufficient evidence that Butcher's beliefs are sincerely held – which the jury specifically found, and Consol does not dispute – and conflict with Consol's employment requirement, that is the end of the matter.

Indeed, once we take out of this case any suggestion that Butcher may have misunderstood the Book of Revelation or the significance of the Mark of the Beast, there is very little left. This case does not present, for instance, the complicated questions that sometimes arise when an employer asserts as a defense to a religious accommodation claim that the requested accommodation would not be feasible, and would instead impose an "undue hardship" on its operations. *See Firestone Fibers*, 515 F.3d at 311–12; *Trans*

---

[3] The EEOC's regulations interpreting Title VII reflect this well-established law: "The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. § 1605.1.

*World Airlines*, 432 U.S. at 79–85 (considering whether requested religious accommodation was feasible).  Quite the contrary:  Consol expressly conceded that allowing Butcher to bypass the scan by entering his identification number into a keypad would impose no additional burdens or costs on the company.  And Consol knew this, of course, because it had provided precisely that accommodation to two other employees who needed it for non-religious reasons – and then, in the very same email, refused to give equal regard to Butcher's request for a religious accommodation.  In light of all of this evidence, we have no reason to question the jury's determination that Consol should be held liable for its response to a conflict between Butcher's sincere religious beliefs and its scanner-system requirements.

### B.

Consol also argues that the EEOC failed to establish the third element of a failure to accommodate claim:  that Butcher suffered some adverse employment action as a result of his failure to comply with Consol's employment requirements.  *See Firestone Fibers*, 515 F.3d at 312.  According to Consol, Butcher was not disciplined or terminated but instead voluntarily retired, and the jury's contrary finding of constructive discharge cannot be sustained on the evidence introduced at trial.

The district court rejected that claim.  Under our precedent, it explained, an employee is constructively discharged – satisfying the third element of a failure to accommodate claim – when "an employer deliberately makes the working conditions of the employee intolerable."  J.A. 1680 (quoting *Whitten v. Fred's, Inc.*, 601 F.3d 231, 248 (4th Cir. 2010), *overruled on other grounds by Vance v. Ball State Univ.*, 133 S. Ct. 2434

16

(2013)).  As to the deliberateness prong, the district court found that evidence of Consol's "complete failure to accommodate, in the face of repeated requests," combined with evidence that Consol was aware of a costless accommodation but nevertheless refused to make it available to Butcher, was sufficient to support the jury's verdict.  J.A. 1680–81 (quoting *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993)).  And the district court dismissed Consol's argument that Butcher's working conditions could not have been "intolerable" as a matter of law because he had recourse to a grievance procedure under his union's collective bargaining agreement, holding that there was sufficient evidence for the jury to find that Consol had left Butcher with no choice but to retire.

Before our court, Consol originally emphasized the "deliberateness" prong of this analysis, arguing that there is insufficient evidence to support a showing that Consol denied Butcher an accommodation in an effort to provoke his retirement.  But as a result of intervening Supreme Court case law, "deliberateness" is no longer a component of a constructive discharge claim.  After the district court's order – but before appellate briefing had concluded – the Supreme Court revisited the standard for constructive discharge in *Green v. Brennan*, 136 S. Ct. 1769 (2016), and expressly rejected a "deliberateness" or intent requirement:

> The whole point of allowing an employee to claim 'constructive' discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him.  We do not also require an employee to come forward with proof—proof that would often be difficult to allege plausibly—that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along.

17

*Id.* at 1779–80 (internal citations omitted); *see also id.* at 1788 (Alito, J., concurring) ("It is abundantly clear that the majority has abandoned the discriminatory-intent requirement[.]").  The Supreme Court now has clearly articulated the standard for constructive discharge, requiring objective "intolerability" – "circumstances of discrimination so intolerable that a reasonable person would resign," *id.* at 1779 – but not "deliberateness," or a subjective intent to force a resignation.  In its reply brief, Consol recognizes as much, dropping its deliberateness argument and contesting only the intolerability of Butcher's working conditions under *Green*.

We note that even before *Green* was decided, our court had questioned whether a "deliberateness" requirement could be squared with evolving Supreme Court case law on constructive discharge.  In *Whitten*, we observed that "[o]ur requirement that the plaintiff prove the employer intended to force the plaintiff to quit is arguably in some tension" with *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), which defined constructive discharge in terms of objectively intolerable working conditions without applying a deliberateness test.  601 F.3d at 248–49 n.8.  But because we believed ourselves bound by circuit precedent, we continued to apply the deliberateness requirement, pending further direction by the Supreme Court.  *Id.*  Now that direction has come.  *Green*'s express holding abrogates our prior case law to the extent it is to the contrary, and under *Green*'s objective standard for constructive discharge, whether

18

Consol refused to accommodate Butcher in "an effort to force Butcher to quit," Br. of Appellant at 34, is no longer relevant.[4]

That leaves only the question of "intolerability," or, more specifically, whether there is sufficient evidence that as a result of Consol's discriminatory conduct, Butcher was subjected to circumstances "so intolerable that a reasonable person would resign." *Green*, 136 S. Ct. at 1779.  We agree with the district court that there exists substantial evidence that Butcher was put in an intolerable position when Consol refused to accommodate his religious objection, requiring him to use a scanner system that Butcher sincerely believed would render him a follower of the Antichrist, "tormented with fire and brimstone."  J.A. 683–84.  This goes well beyond the kind of run-of-the-mill "dissatisfaction with work assignments, [] feeling of being unfairly criticized, or difficult or unpleasant working conditions" that we have viewed as falling short of objective intolerability.  *Cf. Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (internal quotation marks omitted).  And like the district court, we do not think that the future prospect of a successful grievance under a collective bargaining agreement – even assuming, contrary to the union's determination, that the collective bargaining agreement at issue here

---

[4] We also agree with the district court that the evidence at trial was sufficient to support a finding of deliberateness under our prior precedent, which allowed deliberateness to be inferred at least in part from "a complete failure to accommodate, in the face of repeated requests."  *See Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993).  Whether under *Green* or under our prior precedent, in other words, Consol cannot prevail as to deliberateness.

allowed for a grievance based on a right to religious accommodation – would do anything to alleviate the immediate intolerability of Butcher's circumstances.

## III.

We turn now to the district court's denial of Consol's motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure. A district court may grant a new trial only if the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice. *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). On appeal, we respect the district court's decision absent an abuse of discretion, and will disturb that judgment only "in the most exceptional circumstances." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 346 (4th Cir. 2014) (internal quotation marks omitted). When, as here, a new trial is sought based on purported evidentiary errors by the district court, a verdict may be set aside only if an error is so grievous as to have rendered the entire trial unfair. *See Creekmore v. Maryview Hosp.*, 662 F.3d 686, 693 (4th Cir. 2011) (holding that judgment will not be set aside based on erroneous admission of evidence unless "justice so requires or a party's substantial rights are affected").

In its motion for a new trial and again on appeal, Consol objects primarily to the district court's exclusion of evidence regarding the availability of the UMWA's grievance process and to the court's decision to continue jury deliberations on compensatory damages after the jury's first verdict. Finding no error in the district

20

court's determinations, we affirm the district court's denial of Consol's motion for a new trial.

## A.

As noted above, shortly after Butcher's retirement, the UMWA filed a grievance on behalf of Butcher under its collective bargaining agreement with Consol, and then withdrew the grievance after determining that the agreement did not require religious accommodations. Prior to trial, the EEOC filed a motion in limine seeking to exclude all evidence regarding the grievance process, including the union's aborted effort to employ it on Butcher's behalf. The district court deferred judgment, and during the first day of trial, both the EEOC and Consol discussed the grievance process during their opening statements and questioned Butcher about it during his testimony.

On the second day of trial, the district court granted the EEOC's motion, reasoning that Butcher's failure to avail himself further of the grievance process was not relevant to his religious accommodation claim, that what might have happened had the process been completed was speculative, and that admission of evidence on the matter would "violate [Federal Rule of Evidence] 403's prohibition against unfair prejudice to a party or confusion to the jury." J.A. 845–46. Consol moved for a mistrial, arguing that the exclusion of evidence related to the grievance process after Consol had relied on it during the trial's opening day unfairly signaled to the jury that Consol's position was without support. The district court denied the motion, and instead gave curative instructions informing the jury that it should disregard any earlier testimony about the grievance process.

21

Consol argues, first, that the district court abused its discretion in its evidentiary ruling. According to Consol, evidence of Butcher's failure to complete the grievance process is relevant to whether Consol reasonably accommodated Butcher's religious beliefs, because an accommodation could have been reached at the conclusion of that process had Butcher given it a fair chance. Like the district court, we disagree. As the district court explained, "Title VII requires an employer to provide a reasonable accommodation when *requested* by the employee," not only after – and if – a successful grievance process leads to an order by an arbitrator. J.A. 1686 (emphasis in original). Similarly, the possibility of success in a subsequent grievance process has no bearing on constructive discharge: "To prove constructive discharge, a claimant is not required to endure an intolerable work environment" until a grievance process can be utilized and completed. *Id.* That is particularly so here, as the district court recognized, where the UMWA withdrew its grievance because its collective bargaining agreement did not cover religious accommodation claims, so the grievance process would have been unlikely to provide Butcher even with after-the-fact relief.[5]

Nor, we hold, did the district court abuse its discretion in denying Consol's motion for a mistrial after the court excluded evidence about the grievance process. Consol's

---

[5] We note that on appeal, Consol does not challenge the district court's determination – reiterated in its denial of Consol's motion for a new trial – that even if evidence related to the grievance process were deemed relevant, its probative value would be "substantially outweighed by the risk of confusing the issues and misleading [the] jury," rendering it inadmissible under Rule 403 of the Federal Rules of Evidence. J.A. 1688–89. That determination alone is sufficient to sustain the district court's ruling on this point.

theory, again, is that exclusion of the evidence only after Consol had relied on it during the first day of trial improperly conveyed to the jury that Consol's position was incorrect. But the district court, as it explained, made a judgment that "a curative jury instruction would adequately prevent unfair prejudice" to Consol. J.A. 1689. Accordingly, the court informed the jury only that it had "determined that [grievance-related] testimony and evidence is inadmissible because it is not relevant" to resolution of the Title VII claim. J.A. 855. It did not assign blame to either party for raising the issue, nor distinguish between Consol's grievance-related questioning and that of the EEOC. Instead, it directed the jury to disregard *all* testimony related to the grievance process. We presume that a jury follows a curative instruction like this one, *Hinkle v. City of Clarksburg*, 81 F.3d 416, 427 (4th Cir. 1996), and Consol offers no reason to believe that the jury here ignored the curative instruction or otherwise was confused, in a way that prejudiced Consol, by the grievance evidence introduced on the first day of trial.

## B.

As described above, before jury deliberations began in this case, the district court instructed the jury that compensatory damages are "distinct from the amount of wages that [] Butcher would have earned . . . if he had continued in employment" with Consol, and that the jury "should not consider the issue of lost wages" in awarding compensatory damages. J.A. 1697. Nevertheless, on its initial verdict form, where directed to "[s]tate the amount of compensatory damages you award," the jury filled in "salary plus bonus & pension, court cost." *Id.* According to Consol, this answer indicates that the jury

23

intended to award no damages, a decision not inconsistent with its finding of liability, and the district court therefore erred in directing further deliberations on the question.

We disagree. As we have explained, even where an initial failure to award damages is not necessarily inconsistent with a finding of liability, a district court retains discretion under Rule 49(b)(3) of the Federal Rules of Civil Procedure to determine whether the damages verdict "reflects jury confusion or uncertainty," and, if it does, to "clarify the law governing the case and resubmit the verdict for a jury decision." *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 674 (4th Cir. 2015) (internal quotation marks omitted). And the district court here followed precisely the "sensible" procedure that we approved in *Jones*: Faced with a "discrepancy" between its original instructions to the jury and the jury's statement on compensatory damages, it "conferred with counsel, then administered a supplemental jury instruction and sent the jury back to redeliberate." *Id.* Moreover, the court emphasized that the jury was free to return no compensatory damages – "[t]he fact that I am sending you back does not indicate my feelings as to the amount of damages or whether . . . compensatory damages should be awarded," J.A. 1162–63 – and conducted a post-verdict poll of the jury to confirm that its award of $150,000 did not reflect any compensation for lost wages. We see no grounds for disturbing the district court's careful exercise of its discretion.[6]

---

[6] In its motion for a new trial, Consol also argued that the jury's award of $150,000 in compensatory damages is unsupported by the evidence. The district court rejected that claim, pointing to testimony by Butcher and his wife about the detrimental effects of Butcher's early retirement, including emotional strain, depression and a loss of relationships with former coworkers. And as the district court explained, although a (Continued)

24

## C.

Finally, Consol raises a series of additional objections with which we may dispense more briefly.  First, Consol argues that the district court erred by barring it from asking Butcher on cross-examination whether his pension benefits would have been suspended had he obtained a new coal industry job after retirement.  But as the district court observed, "[t]he question sought to elicit only testimony about Butcher's financial incentives for seeking or not seeking employment in a coal mine" – an issue that bears on Butcher's duty to mitigate, which is reserved for the district court to assess in the course of awarding lost wages after the close of trial.  J.A. 1701.  And in any event, the district court concluded, even if the testimony somehow had been relevant to the jury's determination on liability, Consol failed to show that its exclusion resulted in the kind of manifest injustice that would warrant a new trial.  We have no reason to disturb the court's judgment in this regard.

Second, Consol objects on appeal to the district court's failure to give three of its requested jury instructions:  one cautioning the jury against second-guessing Consol's business judgment; one directing the jury to award only nominal damages if it found that the plaintiff had not proven actual damages; and one regarding intolerable work conditions and constructive discharge.  The district court reviewed each of these claims at

---

court may compare a jury award to awards in similar cases in evaluating whether it is excessive, *see Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 672–73 (4th Cir. 2015), we have not required that it do so.  We find no error in the district court's analysis.

length in its decision denying Consol's motion for a new trial, finding as to each that the substance of Consol's instruction was included in the instructions given the jury, at least to the extent it was consistent with governing law. Moreover, the district court concluded, Consol had failed to show any prejudice arising from any of the instructions at issue. Again, we find no error in the district court's disposition of these claims.

## IV.

Finally, we address the parties' objections to the district court's rulings on lost wages and punitive damages. Consol appeals the denial of its post-verdict motion challenging the court's award of back and front pay. And the EEOC cross-appeals, challenging the court's determination that the EEOC's evidence is insufficient to meet the statutory standard for punitive damages. We find no error in either of the district court's rulings, and accordingly affirm.

## A.

We begin with Consol's appeal from the denial of its motion to amend the district court's findings and conclusions with respect to the award of back and front pay and lost benefits. We review the district court's award only for an abuse of discretion. *See Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991). Findings of fact underlying the award are reviewed for clear error, *Taylor v. Home Ins. Co.*, 777 F.2d 849, 860 (4th Cir. 1985), and questions of law related to the award are subject to de novo review, *Jones*, 777 F.3d at 670.

## 1.

26

Consol's first argument is that the district court erred as a matter of law in determining that Butcher was not required to mitigate his damages. But that is not what the district court held. On the contrary, the district court correctly applied the governing law in this area, explaining that a successful Title VII plaintiff's presumptive entitlement to back pay is limited by the statutory duty to mitigate damages. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32 (1982). The burden is on the defendant, the district court recognized, to show that the claimant was not "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged." J.A. 1704 (quoting *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985)). And here, the district court found as a matter of fact that Butcher indeed had reasonably mitigated his damages, and thus that Consol had failed to meet its burden.

Consol disagrees, arguing that Butcher did not mitigate adequately because he failed to seek a new coal mining job in order to protect his pension benefits, and instead accepted a lower-paying construction position. But the district court found to the contrary, concluding that Butcher indeed had "searched for mining jobs at UMWA mines, attended job fairs in the mining industry . . . and applied for a mining job," and that Consol was relying for its claim on coal industry openings that became available only after Butcher already had found steady employment. J.A. 1706. As the district court recognized, "after an extended period of time searching for work without success," a claimant not only *may* but actually "*must* consider accepting suitable lower paying employment in order to satisfy the duty to mitigate damages." J.A. 1704–05 (quoting

*Brady*, 753 F.2d at 1275) (emphasis added). And here, taking into account both economic and personal circumstances, including the "rural economic climate" and Butcher's age and limited educational background, *see Lundy Packing Co. v. Nat'l Labor Relations Bd.*, 856 F.2d 627, 629 (4th Cir. 1988) (listing factors relevant to reasonable diligence in job search), the court determined that Butcher "reasonably took a position . . . with lower pay to obtain income at a time when he had none." J.A. 1705–06.

As we have explained, whether a worker acted reasonably in accepting particular employment is preeminently a question of fact. *See Lundy Packing*, 856 F.2d at 630. Reviewing for clear error only, *see Taylor*, 777 F.2d at 860, we have no ground to second-guess the district court's determination that Consol failed to meet its burden of showing that Butcher's mitigation efforts were unreasonable.

**2.**

Consol also contends that it was entitled to a setoff against the district court's damages award for the pension benefits received by Butcher after his retirement. As the district court explained, a defendant may offset damages with payments already received by a plaintiff as compensation for the injury in question. *See Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 390 (4th Cir. 2010). But benefits that are not provided as compensation, or to "indemnify . . . against liability" for the injury, are treated as coming from a "collateral source," and are not offset against a damages award. *See id.* at 389–90. That is so even where the benefits are provided by the defendant to the plaintiff; if by "their nature" they are not "double compensation for the same injury," then they will be deemed collateral and disregarded in calculating damages. *Id.* (internal quotation marks omitted).

28

We agree with the district court that under *Sloas*, the pension benefits at issue here come from a collateral source, so that no setoff against damages is appropriate. The benefits at issue in *Sloas* were mandatory employer contributions to a railroad employee disability pension fund – a "commingled pool" of contributions from all railroad employers – based on an employee's earnings and career service. *Id.* at 390–91 & n.10. Because it already had made contributions on Sloas's behalf to the disability pension fund, the employer argued, it was entitled to an offset against damages awarded against it in a negligence suit by Sloas, so as to avoid what effectively would be a "double payment." *Id.* at 386. We disagreed. Because employer contributions "were not undertaken voluntarily to indemnify . . . against possible liabilities" for negligence, *id.* at 391 (internal quotation marks omitted), we held they are a "collateral source that may not be considered" in determining a damages award, *id.* at 392.

*Sloas* resolves the setoff question before us today. Like the railroad employer in *Sloas*, Consol did not voluntarily make pension payments to indemnify itself against the liability at issue. Instead, Consol, along with other coal mine employers, was required by its collective bargaining agreement with the UMWA to contribute to a collective pension fund managed by the union, much like the "commingled pool" in *Sloas*. Consol's contributions, in other words, were a standard term of Butcher's employment, rather than compensation for or indemnification against a Title VII violation. Or as the district court explained, "Under *Sloas* a pension is better understood to be from a collateral source in a Title VII case because the employer 'does not provide the benefit to the plaintiff as compensation for his or her injury,' but is providing a contractual retirement benefit that

29

the employee was entitled to regardless of the Title VII violation." J.A. 1710 (quoting *Sloas*, 616 F.3d at 390 (internal quotation marks and citation omitted)).[7]

For its contrary position, Consol relies primarily on *Fariss v. Lynchburg Foundry*, 769 F.2d 958 (4th Cir. 1985), in which this court held that an employer-provided pension should be offset from a back pay claim in an age-discrimination suit, *id.* at 961. As the district court noted, the court in *Fariss* took the position that benefits provided by an employer defendant may never be deemed "collateral," *id.* at 966 n.10 – a position, read broadly, that would be at odds with our more recent holding in *Sloas* that a defendant-provided benefit may be treated as collateral, *see* 616 F.3d at 389 ("That a benefit comes from the defendant . . . does not itself preclude the possibility that it is from a collateral source.") (internal quotation marks omitted). But we need not resolve any tension here. As we explained in *Sloas*, the holding in *Fariss* is limited to payments "made *entirely* by the employer *directly* to the employee," and does not reach an employer contribution to a commingled fund. 616 F.3d at 390 n.10 (quoting *Fariss*, 769 F.2d at 966 n.10) (emphasis in original). And this case, like *Sloas*, involves not a *Fariss*-type direct payment from employer to employee, but instead an employer contribution to a collective fund managed by a third party. At least under these circumstances, as we held in *Sloas*, *Fariss* does not

---

[7] As the district court observed, this conclusion comports with the general rule, followed by many of our sister circuits, that pension benefits are considered a collateral source even where a defendant employer has helped to fund those benefits. *See, e.g.*, *U.S. Can. Co. v. Nat'l Labor Relations Bd.*, 254 F.3d 626, 634 (7th Cir. 2001); *Russo v. Matson Navigation Co.*, 486 F.2d 1018, 1020–21 (9th Cir. 1973); *Haughton v. Blackships, Inc.*, 462 F.2d 788, 790 (5th Cir. 1972).

apply. *Sloas* governs here, and under *Sloas*, the district court properly declined to offset Butcher's collateral pension benefits against his damages award.[8]

## B.

We turn finally to the EEOC's cross-appeal respecting punitive damages. According to the EEOC, the district court erred when it granted Consol's Rule 50(a) motion for judgment as a matter of law at the close of the EEOC's case-in-chief, on the ground that the EEOC's evidence could not sustain an award of punitive damages. We review the grant of Consol's motion de novo, viewing the evidence in the light most favorable to the EEOC, *see EEOC v. Fed. Express Corp.*, 513 F.3d 360, 370–71 (4th Cir. 2008), and we affirm.

Punitive damages are allowed in a Title VII action only under limited circumstances. First, Title VII makes punitive damages, and also compensatory damages, available only in cases of "intentional discrimination," as opposed to cases that proceed on a disparate impact theory. 42 U.S.C. § 1981a(a)(1); *see Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999). And second, the plaintiff must demonstrate that his or her employer acted "with malice or with reckless indifference to the [plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1). Punitive damages, in other words, are authorized "in only a subset of cases involving intentional discrimination," *Kolstad*,

---

[8] Consol raises a final objection to the relief ordered by the district court, challenging the district court's grant of the EEOC's motion for a permanent injunction. But Consol's argument is not specific to the permanent injunction; instead, Consol returns to its argument that there is insufficient evidence to support the jury's verdict against it. We have rejected that argument already, and so have no basis for questioning the district court's entry of a permanent injunction.

527 U.S. at 534, in which the employer acts with the requisite state of mind, *see Fed. Express*, 513 F.3d at 371.

Focusing on the second of these mental states, the EEOC argues that the evidence it presented was sufficient to establish that Consol acted with "reckless indifference" to Butcher's religious accommodation rights. That is a high standard to meet. Reckless indifference under Title VII, the Supreme Court has held, means "recklessness in its subjective form," *Kolstad*, 527 U.S. at 536: that is, that an employer actually knew of or perceived the risk that its conduct would violate Title VII, and then acted despite that subjective knowledge. *See Fed. Express*, 513 F.3d at 371 (plaintiff "must establish that his employer 'at least discriminate[d] in the face of a perceived risk that its actions [would] violate federal law'" (quoting *Kolstad*, 527 U.S. at 536)); *Anderson v. G.D.C. Inc.*, 281 F.3d 452, 460 (4th Cir. 2002) (punitive damages available when an employer "has discriminated in the face of a known risk that his conduct will violate federal law").

The district court held that the EEOC's evidence was insufficient to show that kind of reckless indifference to Butcher's rights, and we agree. As we have explained, the EEOC did put forward sufficient evidence to establish that Consol's efforts to accommodate Butcher's religious beliefs – in particular, its offer to allow Butcher to use his left hand in the scanner – fell short of what is required by Title VII. But that is a different question than whether Consol's management subjectively appreciated that its efforts were inadequate, or at least that there was a risk of inadequacy. And on that point, the evidence, even construed most favorably to the EEOC, simply does not suggest that

the relevant Consol agents engaged in their long negotiations with Butcher in order to reach an agreement that they subjectively believed might violate Title VII.

To make its case, the EEOC rested entirely on evidence that Consol officials were generally "aware that Title VII imposes a duty under some circumstances for employers to give accommodations for religious beliefs." J.A. 791. And as the district court recognized, evidence that an employer has "'at least a rudimentary knowledge' of the import" of Title VII may in some cases give rise to a reasonable inference that the employer acted with reckless indifference in violating that statute. *See Fed. Express*, 513 F.3d at 372 (quoting *Anderson*, 281 F.3d at 460). But in cases like *Federal Express*, that basic knowledge of Title VII's requirements goes hand-in-hand with evidence of a repeated refusal to make any reasonable efforts to accommodate an employee, or to consult or comply with internal compliance policies that would have required more. *Id.* at 373–74. Here, as the district court found, "whatever inference" might arise from Consol's general awareness of its religious accommodation obligations, J.A. 903, there was no similar evidence to suggest that Consol subjectively appreciated a risk that it failed to meet those obligations by offering Butcher an alternative that did not require scanning of his right hand.

Nor, given Consol's efforts to accommodate Butcher, is this the kind of case in which employer conduct is so "egregious" that by itself it is evidence of reckless indifference to Title VII rights, *see Kolstad*, 527 U.S. at 535 ("[E]gregious misconduct is evidence of the requisite mental state[.]"); *Anderson*, 281 F.3d at 460 ("rank offensiveness" of employer conduct may demonstrate "deliberate disregard" for

33

plaintiff's rights in sexual harassment case) – and, indeed, the EEOC does not argue otherwise. To be sure, and as we explain above, Consol's apparent belief that it could rely on its own understanding of scripture to limit the scope of the accommodation it offered Butcher was mistaken, and the EEOC offered ample evidence in support of the jury's verdict that Consol violated Title VII's religious accommodation provision. But the district court did not err in concluding that the EEOC's evidence fell short of allowing for a determination that Consol's Title VII violation was the result of the kind of "reckless indifference" necessary to support an award of punitive damages.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*